```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NORTH CAROLINA
                          WESTERN DIVISION

                        NO. 5:11-HC-2137-H
```

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Petitioner, ) | PROPOSED FINDINGS OF FACTS |
| ) | AND CONCLUSIONS OF LAW |
| v. ) | |
| ) | |
| EARL WEBSTER COX, ) | |
| ) | |
| Respondent. ) | |

## INTRODUCTION

The government seeks the civil commitment of Respondent Earl Webster Cox ("Cox") as a sexually dangerous person under the Adam Walsh Safety and Protection Act of 2006 ("Adam Walsh Act") Pub. L. No. 109-248, Title 111, Section 302(4), 120 Stat. 587, 620-20 (2006), as codified in 18 U.S.C. § 4247-4248. In order to commit Cox pursuant to 18 U.S.C. § 4248, the government must prove by clear and convincing evidence that Cox is "sexually dangerous." Under the Adam Walsh Act, a person is sexually dangerous if he "has engaged or attempted to engage in sexually violent conduct or child molestation and. . . is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). In order to determine whether a person is sexually dangerous to others, a court must find that he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Therefore, the government, by clear and convincing

evidence, must prove that (1) Cox has engaged or attempted to engage in sexually violent conduct or child molestation, (2) Cox suffers from a serious mental illness, abnormality, or disorder, and (3) that based on that serious mental illness, abnormality, or disorder, Cox would have serious difficulty refraining from sexually violent conduct or child molestation. Based on the foregoing facts the Court finds the government has met its burden by clear and convincing evidence and thus orders Cox committed to the custody of the Attorney General under the Adam Walsh Act.

## FINDINGS OF FACTS

### Procedural History

1. At the time of his certification, Cox was in the custody of the Federal Bureau of Prisons ("BOP") at the Federal Correctional Institution in Butner, North Carolina, in service of a 120-month term of imprisonment on his conviction for attempted enticement of a minor to travel in interstate commerce for sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2426(a), and receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(A)(2) imposed by the Honorable Robert E. Blackburn, United States District Judge, in United States v. Cox, Crim. No. 03-CR-45-01-RB. (Ex. 9 at 1260-1262). Judge Blackburn also ordered Cox to serve a three-year term of supervised release. (Ex. 9 at 1263). On July 12, 2011, the Government filed a Certificate of a Sexually Dangerous Person against Cox. (Ex. #1). Cox's original release

date was September 27, 2011. (Id.).

2. The civil commitment trial was held on September 19, 2012. The parties submitted a joint exhibit notebook and the Court took testimony from three forensic psychologists, Drs. Jeffrey J. Davis, Heather Ross, and Joseph Plaud.

Family History, Education, and Personal Data

3. Cox is 54 years old. (Ex. #3 at 1768). Cox is single. (Ex. 3 at 1784). Cox was married in 1987, but separated after less than one year of marriage. (Ex. #8 at 42-43; Ex. 3 at 1784). Cox was born in St. Louis, Missouri. (Ex. 3 at 1781; Ex. 8 at 10). He grew up in Missouri and his family moved to California before returning to Missouri. (Ex. 8 at 10-11). Cox graduated from Jennings Senior High School and joined the Air Force after graduation. (Ex. 8 at 11-12).

4. Cox received training in computer operations at the Air Force Technical School in Biloxi, Mississippi. (Ex. 8 at 12). After graduation from training the Air Force assigned Cox to the Air Force Global Weather Central Command at Offutt Air Force Base in Omaha, Nebraska, where he was stationed from 1986 to 1989. (Ex. 8 at 12-14). Thereafter, Cox was transferred to Rhein-Main Air Force Base in Frankfort, Germany. (Ex. 8 at 14). Cox lived at Rhein-Main Air Force Base for two years. (Ex. 8 at 14-16).

Employment History

5. Cox self-reports that he was employed as a clerk at K &

3

G Shell store in Colorado Springs, Colorado, from November 2002, until he was arrested on the federal charges. (Ex. 13 at 1663). Cox also worked as a shift manager at a 7-Eleven Store in Colorado Springs, Colorado, from January 8, 2002, to November 25, 2002. (Id.). Cox has also been self employed, doing business as "Arousal Exteriors," a female modeling agency. (Id. at 1663-64).

Adjudications, Criminal History, and Convictions

6. On February 5, 2003, a grand jury sitting in the District of Colorado issued a 23-count superseding indictment that charged Cox in Count One with attempting to persuade and induce a person less than 18 years of age to travel in interstate commerce from the State of Virginia to the State of Colorado to engage in sexual activity that would be unlawful under Colorado state law, in violation of 18 U.S.C §§ 2422(a) and 2426(a). (Ex. 11). Count Two of the indictment charged Cox with using the U.S. mail and other facilities and means of interstate commerce to attempt to persuade and induce a person less than 18 years of age to travel in interstate commerce from the State of Virginia to the State of Colorado to engage in sexual activity that would be unlawful under Colorado state law, in violation of 18 U.S.C §§ 2422(b) and 2426(a). (Id.). Count Three charged Cox with possession of a computer hard drive that contained more than 10 video files depicting child pornography, in violation of 18 U.S.C. § 2252(a)(5)(B). (Id.). Counts Four through Twenty-Two charged Cox

4

with receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). (Id.). Lastly, Count Twenty-Three was a forfeiture count.

7.  On December 3, 2004, Judge Blackburn sentenced Cox to 120 months' imprisonment based on Cox's guilty plea to attempted enticement of a minor to travel in interstate commerce for sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2426(a), and receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(A)(2). (Ex. 9 at 1260-62; Ex. 10 at 15). Cox's conviction arose out of an Federal Bureau of Investigation that revealed from November 2002 until January 10, 2003, that Cox, using the name, "YoungStuff," exchanged sexually explicit emails with "Brenda," a woman Cox believed was 14 years old. (Ex. 13 at 1653). Brenda was in fact an FBI agent. (Ex. 13 at 1653).

8.  Cox sent "Brenda" emails encouraging her to leave Virginia and travel via bus to Pueblo, Colorado, so that they could engage in sexual activity and sent her $60.00 to facilitate the trip. (Ex. 13 at 1653). Cox also provided "Brenda" with instructions on how to dress and where to meet him once she arrived in Colorado. (Id.).

9.  On January 10, 2003, an undercover officer, dressed as Cox instructed, met Cox at a nearby McDonald's restaurant. (Id.). Cox identified himself and was arrested. (Id.). Cox made admissions and consented to a search of home and car. (Id.).

5

Agents secured a search warrant and retrieved Cox's home built computer. (Id.).

10. Thereafter, officials with the National High Tech Crime Unit ("NHTCU") contacted the FBI and informed the agency that Cox was under investigation under the screen name, "Wizard," for his role in an international child pornography organization known as the "Brotherhood." (Id.). According to the NHTCU Cox was a member of the Brotherhood. (Id.). The Brotherhood built electronic bulletin boards which permitted its members to exchange videos and pictures depicting the sexual abuse of prepubescent children. (Id.).

11. The electronic bulletin boards had three public boards, Ranchi, Panty Raiders/Lolita Lovers, and Shadows. (Id. At 1653). These public boards were further subdivided into private and semi-private board. (Id. at 1654). In order to access the semi-private and private boards a member must have been promoted within the group and had received a password. (Id. at 1653-54). In order for a member to receive promotion and a password in the group the member must have posted or re-posted a certain number of child pornography images. (Id. at 1654).

12. Cox was an administrator with the Panty Raiders/Lolita Group. (Id.). Cox's duties as an administrator with the Panty Raiders/Lolita Group included deleting old or decommissioned child pornography links and policing member chats to facilitate the

6

distribution of child pornography. (Id.).

13. The FBI examined Cox's seized computer and discovered more than 45,000 image files and videos depicting child pornography, including 19 videos of a man sexually abusing a three to five year old girl referred to as "Baby J." (Ex. 13 at 1654). The videos depicted an adult man raping, engaging in sodomy, and sexually abusing Baby J. (Id.). The investigation lead to the arrest, later indictment, and guilty plea of James Bidwell for the rape of Baby J. (Id.). Bidwell is Baby J.'s biological father and he granted Cox access to his videos, which Cox downloaded. (Id.). Additionally, agents discovered numerous bulletin board chats and email communications with Brotherhood members regarding child pornography and particular child pornography images. (Id.).

15. Cox's criminal history also includes a hands-on sexual offense. On January 20, 1982, Cox was convicted on two counts of sodomy of a child under 16 years of age and one count of taking indecent liberties with a child under age 16. (Id. at 1659). Cox was sentenced to eight years imprisonment. (Id. at 1660). The victims were four girls, ages 5 and 10. (Ex. 14 at 1764). On December 2, 1985, Cox was paroled. (Ex. 13 at 1659). On December 11, 1921, Cox's parole was revoked and he was arrested and returned to Fort Leavenworth until his sentence was discharged. (Id.).

<u>Substance Abuse History</u>

16. Cox does not have a significant drug abuse history. Cox

7

self-reports that he has used marijuana two times. (Ex. 13 at 1663).

## Mental Health Treatment

17. Cox participated in psychotherapy sessions with a clinical psychologist. (Ex. 13 at 1663). According to the PSR, the sessions did not specifically focus on pedophilia, although a clinical note indicated there were discussions of consenual sexual conduct between adults and children. (Id.).

## Forensic Evaluations

18. The Court heard from three forensic psychologists, Drs. Jeffrey Davis, Joseph Plaud, and Heather Ross, and their reports were entered into evidence. (Exs. 3, 5, 7). Dr. Davis is an independent clinical psychologist who specializes in the field of civil and criminal forensic evaluations. (Ex. #2). Dr. Davis is a licensed psychologist in the States of California, Massachusetts, and Michigan. (Id.). Dr. Plaud is also an independent psychologist. (Ex. 6). Dr. Plaud is licensed in the States of New York, Massachusetts, and North Dakota. (Ex. 6 at 1-2). Dr. Heather Ross is a Sex Offender Forensic Psychologist with the Bureau of Prisons. (Ex. 4 at 2).

19. All the psychologist found that Cox met the first prong for commitment in that has previously engaged in child molestation. (Ex. 3 at 5; Ex. 5 at 1212; Ex. 7 at 1). All the psychologist found that Cox suffers from pedophilia, sexually attracted to

8

females, non-exclusive type. (Ex. 3 at 26; Ex. 5 at 13-14; Ex. 2 at 10). Pedophilia is one of a number of paraphilias. A paraphilia, is defined as recurrent intense sexually arousing fantasies, sexual urges or behaviors that generally involve (1) nonhuman object, (2) the suffering or humiliation of oneself or one's partner, (3) children or non-consenting persons that occur over a period of at least six months. (Ex. 3 at 1792; Ex. 5 at 1207; Ex. 7 at 9).

20. Pedophilia is defined in the Diagnostic Statistical Manual, 4th Edition, Text Revised (DSM-IV-TR), as appearing (1) over at least 6 months and are recurring, intense, sexually arousing fantasies, sexual urges (or behavior that involves sexual activity with a prepubescent child or children (whom are generally aged 13 years old or younger), (2) the person has acted on these sexual fantasies, urges or behaviors and it has caused clinically significant distress or interpersonal difficulty and (3) the person is at least 16 years of age and at least five years older than the child or children. (Ex. 3 at 1792; Ex. 5 at 1207; Ex. 7 at 1207). All the experts found that a diagnosis of pedophilia was supported based on Cox's hands-on convictions for sexual offenses involving prepubescent girls over a period greater than six months and child pornography conviction which arose from Cox's intense involvement in an organization dedicated to collecting and sharing child pornography. (Ex. 3 at 1792-93; Ex. 5 at 1207; Ex. 7 at 1-2). All

9

the experts agree that pedophilia is a serious mental illness, abnormality, or disorder and therefore the second prong of the Adam Walsh Act is satisfied in this case.

21. Dr. Davis also considered paraphilia, not otherwise specified based on Cox's apparent sexual interest in pubescent girls but decided against the diagnosis. (Ex. 3 at 1793). Dr. Ross, however, found that a paraphilia, not otherwise specified diagnosis was warranted based on Cox's conviction for attempting to entice what Cox believed was a 14 year old girl. (Ex. 5 at 1208). Further, Dr. Ross cites Cox's admissions to sexual attraction to soft core erotic pictures of teenage girls and several allegations that Cox inappropriately touched teenage girls supported the diagnosis. (Id.).

22. The psychologists also differ as to what, if any, Axis II personality disorder diagnosis may exist. Dr. Davis deferred making an Axis II diagnosis because he did not interview Cox. (Ex. 3 at 26). Dr. Ross interviewed Cox. (Ex. 5 at 1195-96). Dr. Davis did not offer an Axis II diagnosis. (Ex. 5 at 1207). Dr. Plaud, Cox's selected expert, also interview Cox. (Ex. 7 at ). Dr. Plaud found Cox exhibited "significant" symptoms indicative of paranoid and narcissistic personality features or disorders. (Ex. 7 at 10). Dr. Plaud based this diagnosis on his review of the record, clinical interview, and personality testing he conducted on Cox. (Id.). Dr. Plaud found that Cox's distrust and suspicion of

10

others may have played a role in Cox's online involvement in administering the child pornography board and support Dr. Plaud's finding that Cox exhibited paranoid features. (Id.). Further, that Cox's inflation of his self worth, exaggeration of his achievements, and expectations that others would agree with his ideas and support his plans supported Dr. Plaud's finding that Cox exhibited narcissistic personality disorder traits or features. (Id.).

    23.   In order to assess Cox's risk of sexual re-offense, Drs. Davis and Ross relied upon actuarial instruments. Dr. Davis used three acturial instruments, the Static-99R, Static-2002R, and the Minnesota Sex Offender Screening-Tool Revised ("MnSOST-R"). (Ex. 3 at 1795-1805).

    24.   The Static-99R references 10 risk factors consisting of demographic and criminal history information to assess broad dimensions that contribute to risk such as (1) an offender's age at release, (2) whether the offender is single and has ever been a in a relation for two years, (3) the offender's history of general criminal conduct, and (3) the offender's age. (Ex. #3 at 1795-96). Cox scored a five or six (5/6) on the Static-99R based on whether Cox is found to have been in a prior relationship for more than two years. (Ex. 3 at 1795). If Cox's score is 5 that would put him in the moderate-high category to re-offend relative to other sex offenders. If his score is 6 that would put him in a high category

11

to re-offend relative to other sex offenders.  (Id.).

25.  Dr. Davis used the Structured Risk Assessment-Forensic Version ("SRA:FV/Light), an instrument used to identify psychological factors that may function as long-term vulnerabilities for sexual offending.  (Ex. 3 at 1800-04). The SRA: FV/Light factors also called need factors provide a score for three separate domains: Sexual Interest, Relational Style, and Self-Management.  (Id. at 1801).  Cox scored a total score of 3.3 on the SRA:FV/Light which corresponds to a score in the high range. (Id.).  Therefore, Dr. Davis determined Cox's relevant psychological risk factors more closely matched sex offenders in the high-risk/high-needs norm sample.  (Ex. 3 at 1803-04).

26.  Based on a score of five (5), individuals in the sample group had a 25% rate of re-offense after five (5) years and 35% after 10 years.  (Ex. #3 at 1795).  Dr. Davis reports that Cox's score of five (5) falls into the 90th percentile, compared to the sample groups of adult male sexual offenders noted above.  (Id. at 1796).  The recidivism rate for sex offenders with the same score would be approximately 2.2 times that of the typical sexual offender.  (Id.).

27.  The Static-2002R consists of 14 items used to produce relative risk estimates.  (Ex. 3 at 1796).  The items are grouped into five domains: (1) age, (2) persistence of sexual offending, (3) deviant sexual interest, (4) relationship to victim(s), and (5)

12

general criminality. (Ex. 3 at 1797). Cox scored a six on the Static-2002R, which put him in the moderate risk category to re-offend relative to other sex offenders. Based on a score of six even, individuals in the sample group had a 24% rate of re-offense after five (5) years and a 34% re-offense rate after 10 years. (Ex. #3 at 1795). Cox's score of six places him in the 87th percentile. (Ex. 3 at 1795, 1797). The typical sex offender in that group had a median score of four. (Ex. 3 at 1797). The recidivism rate for sex offenders with Cox's score would be 1.7 times the recidivism rate of the typical sexual offender. (Id.).

28. The MnSOST-R definition of sexual recidivism is the likelihood that an offender will be rearrested for a hands-on sexual offense within the first six years of the offenders release. (Ex. 3 at 1797). The MnSOST-R is primarily used on offenders convicted who have been convicted of either rape or extra-familial sex offenses. (Id.). Dr. Davis scored Cox an eight on the MnSOST-R, which corresponds to a score in the high risk range. (Ex. 3 at 1798).

29. Dr. Ross used the Static-99R. (Ex. 5 at 1208-1210). Dr. Ross also scored Cox a five or six (5/6) on the Static-99R, which corresponds to either a moderate/high or high risk of re-offense. (Ex. 5 at 1209). Dr. Plaud did not use an actuarial instrument to assess risk of re-offense.

30. All experts reviewed relevant psychological and dynamic

13

risk factors to determine Cox's risk of re-offense. Dynamic risk factors are factors subject to change over time and as such are not scored on actuarial instruments. (Ex. 3 at 1798; Ex. 5 at 1210). Drs. Davis and Ross used STABLE-2007. (Id.). The STABLE-2007 as provided an empirically guided method to review the following dynamic factors: (1) Significant Social Influences, (2) Intimacy Deficits, (3) Sexual Self-Regulation, (4) Cooperation with Supervision, and (4) Cox's General Self-regulation. (Ex. 3 at 1798; Ex. 5 at 1210).

31. Both Drs Davis and Ross identified Cox's association with a sex offender as dynamic risk factor. (Ex. 3 at 1799; Ex. 5 at 1209-1211). Drs. Davis and Ross also have identified intimacy deficits as possible risk factors based on Cox's lack of a stable relationship. (Ex. 3 at 1799; Ex. 5 at 1211). Drs. Davis and Ross also identify sexual self regulation as a dynamic risk factor based on his long standing and pronounce deviant sexual interests in prepubescent and pubescent girls. (Id.). Dr. Davis identified Cox's failure to cooperate with supervision as a dynamic risk factor based on his parole revocation, although Dr. Davis does credit Cox for cooperating with supervision while incarcerated. (Ex. 3 at 1800).

32. Dr. Plaud used the Sexual Violence Risk-20 ("SVR-20"), an instrument used to examine 20 various dynamic factors related to

14

sexual re-offense.[1] Dr. Plaud found Cox possessed an number of the dynamic factors under the SVR-20 such as sexual deviation, employment problems, past supervision failure, high density sex offenses, multiple offenses, an escalation of the severity of the offenses, extreme minimization and denial of offenses, attitudes that support or condone offenses, a lack of realistic planning, and negative attitudes towards intervention all indicated that would pose a significant risk of re-offending. (Ex. 7 at 11).

33. Dr. Plaud also administered the PAI, an objective inventory of adult personality test to determine what Dr. Plaud described as possible psychopathological syndromes and the IPDE, an instrument developed to provide a uniform approach to evaluating personality disorders in the DSM-IV . (Ex. 7 at 11-12). Dr. Plaud reported that PAI testing revealed Cox tended to portray

---

[1]Dr. Plaud categorized the 20 factors as those relating to psychological adjustment, sexual offenses, and future plans. Psychological adjustments include: (1) the presence of sexual deviance, (2) a victim of child abuse, (3) psychopathy, (4) the presence of a major mental illness, (5) a history of substance abuse, (6) endorsement of suicidal or homicidal ideation, (7) relationship problems, (8) employment problems, (9) a history of nonsexual violent offenses, (10) a history of nonviolent offenses, and (11) past supervision failure. Ex. 7 at 11. Sexual offenses include: (12) a high density sexual offenses within a relatively short period, (13) multiple types of sexual offenses, (14) causing victims physical harm, (15) the use of weapons or threats, (16) the presence of escalating sexual offenses or severity of sexual offenses, (17) extreme minimization or denial of responsibility, and (18) attitudes that support or condone sexual offenses. (Id.). Future plans include: (19)lack of realistic plans, and (20) negative attitudes towards intervention. (Id.).

15

himself as free of common shortcomings, did not readily recognzie minor faults, and was distant in personal relationships. Dr. Plaud noted that results from the IPDE indicate Cox exhibited both paranoid and narcissistic personality disorders when combined with Cox's paraphilic demonstrates Cox continues to be sexually deviant. (Ex. 7 at 9, 13).

34. All the experts also examined possible protective factors to varying degrees that would decreased the risk of further sexual offending also known as protective factors. (Ex. 3 at 1804; Ex. 5 at 1211; Ex. 7 at 10). These factors include (1) being in the community without sexually reoffending for a period of 10 years, (2) having less than 15 years left in the offender's time at risk due to illness or physical condition that significantly decreases the motivation and/or the offender's ability to sexual reoffend, and (3) the offender's advanced age. (Id.).

35. All the experts agree that protective factors do not significantly lessen Cox's sexual dangerousness. (Id.).

<u>CONCLUSIONS OF LAW</u>

<u>Cox has engaged in or attempted to engage in sexually violent conduct or child molestation</u>

36. The Court finds that the government has proved by clear and convincing evidence that Cox has engaged in or attempted to engage in sexually violent conduct or child molestation. This conclusion is relatively unremarkable in that Cox has a documented criminal history that includes Cox's conviction for hands-on and

16

offenses and an attempt to entice an individual he believed to be a minor across state lines to engage in sexual activity.

### Cox is sexually dangerous to others

37. The government must show that Cox's difficulty will be "serious." The government, however, need not establish that the person it seeks to commit will, or is likely to, reoffend. See United States v. Hunt, 643 F.Supp.2d 161, 179-81 (D. Mass. 2009). Instead, the analysis focuses on Cox's volitional control understood in relation to his mental illness. See United States v. Carta, 2011 WL 2680734, slip op., at 22. This determination requires more than relying on recidivism rates of past offenders, but an analysis of a range of different factors, including Cox's history before incarceration, his time in prison, and the opinion of experts. (Id.).

38. The determination of this prong of the analysis is informed by the constitutional constraints on the civil commitment scheme. Carta, at *23. In Kansas v. Crane, 534 U.S. 411 (2002), the Supreme Court held that in order to civilly commit someone for sexual dangerousness "there must be proof of serious difficulty in controlling behavior." (Id. at 413). This standard allows courts wide discretion in considering a number of factors that are relevant to sexual dangerousness. Carta, *23. The standard does not have "any kind of narrow or technical meaning; nor was it demonstrable with a mathematical precision." Crane, 534 U.S. at

413.

39. The final analysis must not be just whether Cox exhibits traits shared by recidivists. Carta, at *23. Rather, Cox's volitional control must be "viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself. . . [in such a way that] distinguish[es] [him] from the dangerous but typical recidivist convicted in an ordinary criminal case." (Id.).

40. The Court finds that the government has proved by clear and convincing evidence that Cox suffers from pedophilia, a serious mental illness, abnormality, or disorder. This finding is based on the unanimous diagnosis of all the testifying experts, including Cox's selected expert, Dr. Plaud. The Court further finds that the government has proved by clear and convincing evidence that Cox suffers from paraphilia, not otherwise specified. The Court credits Dr. Ross's finding that based on Cox's attempt to entice an individual he believed was a 14-year-old girl across state lines and deep interest in child pornography depicting pubescent girls that a finding of paraphilia, not otherwise is warranted.

38. The Court also finds instructive Dr. Plaud's report and testimony that Cox suffers from a personality disorder and therefore finds Cox suffers from a personality disorder marked by paranoid and narcissistic features.

39. The Court has considered the actuarial testing the

18

experts performed and accepts the various experts findings that Cox scores reflect a moderate high to high rate of re-offense when compared to sample groups of sex offenders. The Court has also considered the dynamic factors identified by the various other tests the experts through their independent analysis of Cox's unique psychological profile. The Court credits their joint assessment that Cox possesses various dynamic factors that indicate Cox will have serious difficulty in refraining from engaging in sexually violent conduct if released. In particular, the Court accepts and adopts the various risk analysis identified by the experts. (Ex. 3 at 1805; Ex. 5 at 1212; Ex. 7 at 10-11).

## CONCLUSION

41. Because the government has established by clear and convincing evidence that Cox is a sexually dangerous person under 18 U.4247(a)(5), Cox should be committed to the custody of the Attorney General until he is no longer a sexually dangerous person under the Adam Walsh Act.

Respectfully submitted on this the 12th day of September 2012.

        THOMAS G. WALKER
        United States Attorney


        /s/ Michael G. James
        MICHAEL G. JAMES
        Assistant United States Attorney
        Civil Division
        310 New Bern Avenue, Suite 800
        Raleigh, North Carolina 27601
        Phone: (919) 856-4530
        Facsimile: (919) 856-4821

NY Bar No. 2481414
E-mail: Mike.James@usdoj.gov

CERTIFICATE OF SERVICE

This is to certify that I have this 12th day of September 2012, served a copy of the Government's proposed findings of facts and conclusions of law to the respondent by CM/ECF addressed to Mr. Samuel Forehand

/s/ Michael G. James
MICHAEL G. JAMES
Assistant United States Attorney
Civil Division
310 New Bern Avenue, Suite 800
Raleigh, North Carolina 27601
Phone: (919) 856-4530
Facsimile: (919) 856-4821
NY Bar No. 2481414
E-mail: Mike.James@usdoj.gov