IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-HC-2137-H

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | **RESPONDENT'S PROPOSED** |
| | ) | **FINDINGS OF FACT** |
| v. | ) | **AND CONCLUSIONS OF LAW** |
| | ) | |
| EARL WEBSTER COX, | ) | Fed. R. Civ. P. 52(a)(1) |
| | ) | Local Civil Rule 52.1 |
| Respondent. | ) | |

COMES NOW Respondent Earl Webster Cox, by and through undersigned counsel and pursuant to Fed. R. Civ. P. 52(a)(1) and Local Civil Rule 52.1, submitting the following proposed findings of fact and conclusions of law.

INTRODUCTION

1.    The Government petitions the Court pursuant to § 302 of the Adam Walsh Child Protection and Public Safety Act ("Adam Walsh Act"), Pub. L. 109-248, § 302, 120 Stat. 587, 619-22 (2006) (codified at 18 U.S.C. §§ 4241, 4247, 4248 (2006)), to commit civilly Respondent Earl Webster Cox to the custody of the U.S. Attorney General on the ground that he is a "sexually dangerous person" within the meaning of 18 U.S.C. §§ 4247(a)(5) and 4248(d).

2.    To succeed in its petition, the Government must prove three facts by clear and convincing evidence: that Cox "(1) 'has

engaged or attempted to engage in . . . child molestation' in the past"; that Cox "(2) currently 'suffers from a serious mental illness, abnormality, or disorder'"; and, finally, that, "(3) as a result of the illness, abnormality, or disorder, [Cox] 'would have serious difficulty in refraining from . . . child molestation if released.'" <u>United States v. Hall</u>, 664 F.3d 456, 461 (4th Cir. 2012) (quoting 18 U.S.C. § 4247(a)(5)-(6)) (internal citations omitted).

3. For the reasons set forth herein, and with the above-described statutory framework in mind, the Court FINDS and CONCLUDES that the Government has failed to prove "by clear and convincing evidence that [Cox] is a sexually dangerous person" within the meaning of 18 U.S.C. § 4248(d).

<u>PROCEDURAL HISTORY</u>

4. On 12 July 2011, the Government commenced the instant civil action pursuant to 18 U.S.C. § 4248(a) by filing the "Certification of a Sexually Dangerous Person" that the Chairperson of the Certification Review Panel of the federal Bureau of Prisons ("BOP") prepared on 13 June 2011 with respect to Cox. Certification of a Sexually Dangerous Person, ECF No. 1-1; Prehearing Order 2, ECF No. 35.

5. At the time of the commencement of the instant action, Cox was in the custody of the BOP at the Federal Correctional Institution in Butner, North Carolina ("FCI-Butner"), serving a

120-month term of imprisonment for his 4 December 2003 convictions for the attempted enticement of a minor to travel in interstate commerce for sexual activity in violation of 18 U.S.C. §§ 2422(a) and 2426(a), and receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A).  See Prehearing Order 2, ECF No. 35.

6.  The Court conducted an evidentiary hearing on 19 September 2012, per 18 U.S.C. §§ 4247(d), 4248(a), and 4248(c).

7.  At that hearing, the Government presented the testimony of three expert witnesses: Heather H. Ross, Ph.D.; Jeffrey Davis, Ph.D.; and Joseph J. Plaud, Ph.D.  The Government also presented the testimony of Cox as an adverse witness.

8.  Following that hearing, the Court has reviewed carefully all of the evidence that the parties have submitted, and, after receiving the testimony of the parties' witnesses and giving due consideration to the parties' arguments, now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

9.  Before the Court proceed to make any findings, it notes that the Government's burden of proof under the Adam Walsh Act (i.e., clear and convincing evidence), requires "evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, []

evidence that proves the facts at issue to be highly probable." Hall, 664 F.3d at 461 (quoting Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir. 2001)). The Court resolves the instant factual issues with that standard in mind.

## I.    Cox's Personal History.

10.    Cox is a 55-year-old Caucasian male. See Forensic Precertification Evaluation 1, ECF No. 12-1, Government's Ex. 5, at 1 [hereinafter Ross Report] (listing Cox's date of birth as 17 July 1957). He was born in St. Louis, Missouri. Evaluation for Civil Commitment as a Sexually Dangerous Person as Defined in 18 U.S.C. § 4247(A)(5), at 14, ECF No. 13-1, Government's Ex. 3, at 14 [hereinafter Davis Report]. He has two older sisters and two younger brothers, with whom Cox maintains positive relationships. See Psychological and Psychosexual Evaluation of Mr. Earl Cox 2, ECF No. 19, Government's Ex. 7, at 2 [hereinafter Plaud Report]; see also Davis Report 14.

11.    Cox's father worked as a restaurant manager. Plaud Report 2. Both he and Cox's mother apparently abused alcohol. See Plaud Report 2 (describing Cox's father as "an alcoholic with stomach problems" and Cox's mother as a "heavy drinker"). One report indicates that Cox reported witnessing his father rape his mother when Cox was seven years old. Ross Report 3.

12.    Cox's father died due to a ruptured ulcer when Cox was 12 years old. Ross Report 3; Davis Report 14; Plaud Report 2.

Reports vary with respect to whether Cox discovered his father's body. Ross Report 3; Davis Report 14. In any event, the death of his father appears to have deeply troubled Cox, who has stated that he felt as though "his 'life ended' at age 12, when his father died." Davis Report 14.

13. After his father's death, Cox's mother remarried. Ross Report 3; Davis Report 15; Plaud Report 2. Cox's stepfather drank heavily. Plaud Report 2. He verbally and physically abused Cox, Cox's brothers, and Cox's mother, Ross Report 3, striking Cox with a closed fist and breaking the leg of Cox's mother, Davis Report 15. Cox denies that his stepfather sexually abused him. Davis Report 15. Due to the abuse, Cox, at age 13, frequently ran away from home. Ross Report 3; Davis Report 15; Plaud Report 2.

14. Cox graduated from high school in 1975. Ross Report 4; Davis Report 15; Plaud Report 2. He earned good grades and experienced no behavioral problems. Ross Report 4; Davis Report 15. He completed two college courses while still in high school, Ross Report 4, took other college courses following his graduation from high school, Plaud Report 2, and, ultimately, completed a one-year certification program in computer programming languages, Ross Report 4.

15. Cox served in the U.S. Air Force as a computer operator from 1975 to 1980. Ross Report 4; Davis Report 15-16.

The Air Force stationed Cox in Mississippi, Nebraska, and Germany. Ross Report 4; Davis Report 16. As the Court discusses further infra, Cox's military service came to an abrupt end in 1980 upon his convictions for several sex-related offenses and his resulting dishonorable discharge. Ross Report 4; Davis Report 5; Plaud Report 3.

16. Cox's other employment history includes, at least, a job as a clerk at a gas station. See Ross Report 4; see also Davis Report 16 (stating that Cox "worked as a clerk at a K&G Shell store" and as a "shift manager for 7-Eleven"). Cox also reports self-employment at some point prior to 2002, during which time he owned a business by the name of "Arousing Exteriors." Ross Report 4; Davis Report 16. According to Ross's report of her forensic psychological evaluation of Cox, however, Cox did not report any income for 1996 to 1998 and did not file income tax returns from 1999 to 2002. Ross Report 4.

17. Cox suffers from several maladies related to his physical health, including obesity, hypertension, diabetes mellitus type II, abnormal glucose, low vision in both eyes, hyperthyroidism, degeneration of lumb or lumbosacral intervertebral disc, long-term use of anticoagulants, a disorder similar to psoriasis, unspecified hyperlipidemia, esophageal

reflux, cellulitis and abscess of toe, and atrial fibrillation.[1]
Davis Report 23-24.

    18.  Cox is married, although he and his wife have remained
separated for 22 of the 23 years of their marriage.  Ross Report
5.  Cox met his wife in prison.  Ross Report 5.  After her
release, she became pregnant (i.e., with a separate partner),
and suggested that she and Cox marry for the benefit of the
child.  Ross Report 5.  Cox agreed, but reports that he and his
wife eventually separated amicably, apparently due to a lack of
compatibility.  Ross Report 5.

    19.  Cox additionally had one other long-term relationship,
which he reports lasted three years.  Ross Report 5.  He denies
having children.  Ross Report 5.

    **A.  Cox's Criminal History.**

    20.  Cox has twice obtained convictions for various sex-
related offenses: once in a proceeding before a general court-
martial, see generally United States v. Cox, 18 M.J. 72 (C.M.A.
1984); and once in a proceeding before the U.S. District Court
for the District of Colorado, see Davis Report 9-14.  In 1990,

---

[1] Cox introduced into evidence several records and notes of Cox's
clinical visits with BOP medical staff and Cox's general medical
history during his time in BOP custody, which documents
chronicle Cox's myriad health problems, Resp't Exs. 9-21, 23-27,
29-24, 26-38, consistent difficulty traversing significant
distances, Resp't Exs. 9-21, his continuing need for extensive
medication, Resp't Ex. 22, and his use and reliance upon a
number of medical devices, Resp't Ex. 28, 35.

the State of Missouri additionally charged Cox with assault for his alleged inappropriate contact with two minor children.[2] Davis Report 6-9.

21.   The Court discusses each of the three above-described matters in chronological order.

### 1.   Cox's Court-Martial.

22.   While he served in the U.S. Air Force at Rhein-Main Air Base in Germany, the Government convicted Cox, following a trial before an officer panel, of

> [o]ne specification of sodomy with a child under the age of sixteen years, in violation of Article 125, Uniform Code of Military Justice, 10 U.S.C. § 925; three specifications of assault consummated by a battery on children under the age of sixteen years, in violation of Article 128, UCMJ, 10 U.S.C. § 928; and six specifications of taking indecent liberties with children under the age of sixteen years, in violation of Article 134, UCMJ, 10 U.S.C. § 934.

Cox, 18 M.J. at 73 n.*.

23.   The offense conduct related to the above convictions involved Cox's sexual assault over a period of nine months of four girls between the ages of eight and eleven, whom Cox apparently babysat.  Davis Report 6.  Specifically, the Government charged that Cox licked the vaginal area of one of the girls, that he removed the pants of one of the girls and inserted a candy cane into her vagina, that he inserted one of

---

[2] Cox has no history of BOP sanctions.

his fingers into the vagina of one of the girls and forced her to rub her genitalia with his hand, that he rubbed one of the girl's "private parts while the child was clothed," that he grabbed one of the girls by the waist, turned her upside down, and removed her underwear, and, finally, that he grabbed one of the girls by the waist and turned her upside down with her legs apart. Davis Report 6.

24. Cox received an eight-year term of imprisonment for the above-described convictions. Cox, 18 M.J. at 74. He obtained parole on 2 December 1985. Davis Report 6.

### 2. The Assault Charge.

25. On 5 October 1989, officers of the Overland Police Department in Overland, Missouri, arrested Cox on charges stemming from his alleged inappropriate contact with two seven-year-old girls. Davis Report 6. The State of Missouri eventually charged Cox with assault, after prosecutors determined that the alleged offense conduct could not support a charge of sexual abuse. Davis Report 7. Eventually, however, the State of Missouri dismissed the charge with prejudice. Davis Report 7-8.

### 3. The Index Offenses.

26. On 14 August 2003, Cox pled guilty in the U.S. District Court for the District of Colorado pursuant to a plea agreement to the attempted enticement of a minor to travel in

interstate commerce for sexual activity in violation of 18 U.S.C. §§ 2422(a) and 2426(a), and receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A), which charges constituted counts one and four of the 23-count superseding indictment that the Government filed in the district court on 25 February 2003. Davis Report 9.

27. The above-described charges stemmed from Cox's communications with an undercover agent of the Federal Bureau of Investigation ("FBI"), which communications occurred between November 2002 and 10 January 2003. Davis Report 10. In said communications, Cox sent the undercover agent "emails telling her he wanted to 'fuck' her and spank her." Davis Report 10. During this time, the undercover agent represented herself to be a 14-year-old girl living in Virginia. Davis Report 10.

28. Eventually, Cox informed the undercover agent that he wanted her to leave home and travel to Colorado, where Cox resided at the time, and he sent her $60.00 with instructions to use that money for bus fare. Davis Report 10. Cox told the undercover agent that he would meet her at a fast food restaurant near a bus station in Pueblo, Colorado. Davis Report 10. He further instructed her to wear a red tube top and no underwear. Davis Report 10.

29. On 10 January 2003, an undercover police officer (i.e., an undercover officer distinct from the undercover agent)

met Cox at the restaurant. Davis Report 10. Cox approached
her, stating, "[Y]ou don't look fourteen." Davis Report 10.
FBI agents placed Cox under arrest. Davis Report 10.

30. Cox waived his right to remain silent, admitted the
above-described conduct, and consented to a search of his home
and vehicle. Davis Report 10. At Cox's home, FBI agents seized
Cox's computer. Davis Report 11. The FBI agents later obtained
a warrant to search the same. Davis Report 11.

31. Not long thereafter, officials with the National High
Tech Crime Unit ("NHTCU") contacted the FBI agents responsible
for Cox's arrest and informed them that the NHTCU had identified
Cox as the subject of an international investigation into the
"Brotherhood," a child pornography group. Davis Report 11.
According to the NHTCU, the Brotherhood built electronic
bulletin boards online for its members to use in exchanging and
posting hyperlinks to child pornography images. Davis Report
11.

32. The NHTCU explained that the Brotherhood's bulletin
boards had three main public areas, which the Brotherhood titled
Ranchi, Panty Raiders/Lolita Lovers, and Shadows. Davis Report
11. The NHTCU believed that the Brotherhood used these public
areas as a means of screening potential members for access to
private or semi-private boards. Davis Report 11. Specifically,
according to the NHTCU, a member could only access such bulletin

boards after posting or reposting a certain number of hyperlinks to child pornography images. Davis Report 11.

33. By Cox's admission, Cox served for several years as an administrator for the Panty Raiders/Lolita Lovers public bulletin board. Davis Report 11. In that capacity, Cox maintained and operated the public bulletin board by deleting old or decommissioned hyperlinks to child pornography and policing chats, thereby facilitating the distribution of the hyperlinks to child pornography appearing in or accessible from that bulletin board. Davis Report 11.

34. The search of Cox's computer ultimately uncovered in excess of 45,000 image files and videos containing what appeared to constitute child pornography. Davis Report 11. The videos included 19 videos of a man sexually abusing a girl between the ages of three and five. Davis Report 11. Further investigation revealed that those 19 videos depicted a man sexually abusing his biological daughter. Davis Report 11.

35. Cox cooperated with federal authorities following his arrest and indictment, which cooperation ultimately led to the arrests of over 60 people, all of whom had some involvement in the receipt or distribution of the hyperlinks to child pornography on the Brotherhood's several online bulletin boards. Davis Report 13.

36. For the above-described convictions, the district court imposed a 120-month term of imprisonment and a three-year term of supervised release upon Cox. Prehearing Order 2, ECF No. 35. That 120-month term of imprisonment expired on 27 September 2011. Prehearing Order 2, ECF No. 35. Cox remains, however, in the custody of the BOP pending the Court's disposition of the instant civil commitment proceeding.

37. The district court also imposed several conditions upon Cox's three-year term of supervised release, including: a condition requiring Cox to participate in an approved program of sex-offender evaluation and treatment, which program might include polygraph and plethysmograph examinations; and a condition requiring Cox to allow the probation officer to examine and copy the data within any computer that Cox uses at any reasonable time and without any prior notice.[3] Am. J. 4-5, United States v. Cox, No. 03-DCR-45-RB-1 (D. Colo. Feb. 24, 2004), Gov't Ex. 9, at 4-5.

---

[3] The district court further imposed the district's standard conditions of supervised release upon Cox's term of supervised release, including conditions that, inter alia, require Cox to submit truthful and complete reports to his probation officer within the first five days of every month, to answer truthfully his probation officer's inquiries, to work regularly at a lawful occupation, to notify the probation officer at least 10 days prior to any change in residence or employment, to refrain from associating with any felon, to permit his probation officer to visit him at any time at home or elsewhere, and to notify third parties of the risks that Cox's criminal record or personal history may occasion. Am. J. 4-5, United States v. Cox, No. 03-DCR-45-RB-1 (D. Colo. Feb. 24, 2004), Gov't Ex. 9, at 4-5.

**4.  The Court's findings with respect to 18 U.S.C. § 4247(a)(5).**

38.  The Court finds the above-described convictions suffice to establish by clear and convincing evidence that Cox has engaged and has attempted to engage in child molestation within the meaning of 18 U.S.C. § 4247(a)(5).

39.  The Court does not, in making the above finding, rely in any way on the non-adjudicated assault charge.  The Court notes that the State of Missouri dismissed that charge with prejudice, and that no jury ever determined Cox's guilt with respect to that charge.  The Court will not now call into question the State of Missouri's judgment that its case against Cox should, in fact, have resulted in a voluntary dismissal with prejudice.

40.  Nevertheless, the Government has satisfied its burden of proof with respect to the requirements of 18 U.S.C. § 4247(a)(5) by presenting evidence of Cox's prior convictions for engaging or attempting to engage in child molestation, leaving only the Court's determination with respect to the Government's burden under 18 U.S.C. § 4247(a)(6).

**B.  Cox's Mental-Health History.**

41.  While he remained incarcerated for his convictions by the general court-martial, Cox completed four years of sex-offender treatment.  Davis Report 20.  He declined subsequent

sex-offender treatment during his incarceration for the index offense. Ross Report 7.

42. Upon his parole, moreover, Cox participated in outpatient psychiatric care. Davis Report 21.

43. Cox declined to participate in sex-offender treatment following his convictions in the U.S. District Court for the District of Colorado and his resulting return to prison. Davis Report 27.

## II. Cox's Current Status.

44. The above facts, while relevant to a determination of sexual dangerousness, do not dispose of the central issue involved in these proceedings: Whether Cox presently suffer from a serious mental illness, abnormality, or defect that will cause him to have serious difficulty in refraining from sexually violent conduct or child molestation upon his release from imprisonment. See 18 U.S.C. § 4247(a)(6); see also Hall, 664 F.3d at 461.

45. "The 'serious difficulty' prong of § 4248's certification proceeding refers to the degree of the person's 'volitional impairment,' which impacts the person's ability to refrain from acting upon his deviant sexual interests." Id. at 463 (citing Kansas v. Hendricks, 521 U.S. 346, 358 (1997)). As the Supreme Court of the United States noted in Kansas v. Crane,

> [This] lack of control [or] inability to control
> behavior will not be demonstrable with
> mathematical precision. It is enough to say that
> there must be proof of serious difficulty in
> controlling behavior. And this, when viewed in
> light of such features of the case as the nature
> of the psychiatric diagnosis, and the severity of
> the mental abnormality itself, must be sufficient
> to distinguish the dangerous sexual offender
> whose serious mental illness, abnormality, or
> disorder subjects him to civil commitment from
> the dangerous but typical recidivist convicted in
> an ordinary criminal case.

535 U.S. 407, 413 (2002).

46. At the hearing in this matter, the parties presented expert opinions and testimony concerning Cox's current mental-health status, the most important factor bearing on the Court's determination in this action. The Court summarizes the opinions and testimony below.

**A. Heather H. Ross, Ph.D.**

47. The Government presented the testimony of Dr. Ross, whom the Government tendered and the Court accepted as an expert in the field of forensic psychology.

48. Dr. Ross conducted the pre-certification evaluation of Cox, which evaluation she submitted to the BOP's Certification Review Panel to assist the same in determining whether it would certify Cox as a sexually dangerous person pursuant to the Adam Walsh Act. Ross Report 1.

49. In her report of that evaluation, Dr. Ross opined that Cox warranted the following diagnoses, the criteria for which

Dr. Ross derived from the <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed., text rev.) [hereinafter DSM-IV-TR]:

a.   Axis I diagnoses of pedophilia, sexually attracted to females, nonexclusive type, and paraphilia not otherwise specified;

b.   No Axis II diagnosis; and

c.   Axis III diagnoses of cellulitis and abscess of tow, esophageal reflux, hyperlipidemia, other disorder similar to psoriasis, degeneration of lumb or lumbosacral intervertebral disc, hyperthyroidism (in remission), low vision, abnormal glucose, diabetes mellitus, type II, and hypertension.

50.  Dr. Ross, citing the DSM-IV-TR, identifies the essential features of a paraphilia as recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving (1) nonhuman objects, (2) the suffering or humiliation of oneself or one's partner, or (3) children or other nonconsenting persons, which fantasies occur over a period of at least six months.  Ross Report 13.  Dr. Ross further identifies pedophilia as referring to sexual fantasies, urges, or behaviors with prepubescent children.  Ross Report 13.

51.  In her report, Dr. Ross explained her conclusion that Cox suffered from pedophilia as follows:

> Mr. Cox has a conviction for Sodomy and six
> convictions for Indecent Liberties involving
> female children under 12 years old.  These

charges involved at least four victims.  He has
also been convicted for Receipt of Child
Pornography.  He was a moderator of an online
board in which members posted links to child
pornography; images of child pornography
involving preschool-age children were discovered
on his computer.  He was also charged with
striking the bare buttocks of a seven-year-old
female, in the course of a game of hide-and-seek.
Two parents of alleged victims noted that Mr. Cox
demonstrated "great interest" in their young
children.  Although Mr. Cox did not endorse
viewing pornography involving preadolescent
children and he denied having sexual fantasies
about the same age group, his behavior reflects a
sexual interest in preadolescent children.  As
such, a diagnosis of Pedophilia is appropriate.

Ross Report 13.  And, with respect to her diagnosis of

paraphilia, Dr. Ross stated further:

In addition to his offenses against prepubescent
females, Mr. Cox has also demonstrated sexual
interest in minor pubescent females.  He was
convicted of Attempted Enticement of a Minor to
Travel in Interstate Commerce for Sexual
Activity, after sending money for bus fare to an
undercover law enforcement officer posing as a
14-year-old girl.  He engaged in email
communications with this individual, referencing
her becoming his "sex-slave," and attempted to
meet her after she was scheduled to arrive by bus
. . . . [F]urther evidence of his sexual interest
in adolescent females is demonstrated in his
moderation of an online child pornography board,
as well as his statement during the current
evaluation that "[he is] not turned off by
looking at soft core pictures of teenage girls."
Although no other formal charges involving sexual
interest in adolescent girls were noted in
records, several allegations of inappropriate
touching or contact with teenage girls were
noted.  Mr. Cox therefore meets criteria for
Paraphilia NOS.

Ross Report 13-14 (third modification in original).

52. After determining that Cox warranted the above-described diagnoses, Dr. Ross analyzed Cox's risk for recidivism using the Static-99R. Ross Report 14-16. The Static-99R is an actuarial instrument that identifies an individual's statistical risk for recidivism. Ross Report 14. The Static-99R accounts for certain risk factors, including age less than 35 years old, prior sexual offenses, having unrelated victims, having male victims, having never lived with a lover for more than two years, having a conviction for a non-sexual violent charge at the time of the index offense, prior convictions for non-sexual violence, number of prior sentencing dates, prior convictions for non-contact sexual offenses, and the presence of stranger victims. Ross Report 14-15.

53. Dr. Ross scored Cox at five or six on a scale that theoretically ranges from zero to 12, with 12 representing the highest risk for recidivism. Ross Report 15. Specifically, Dr. Ross attributed points to Cox as follows: negative one point for age; zero or one point for a sexual relationship lasting more than two years; one point for a prior conviction for non-sexual violence; three points for prior convictions for sex-related offenses; one point for a prior conviction for a non-contact sex offense; and one point for having an unrelated victim. Ross Report 15.

54.  According to Dr. Ross, a score of five would place Cox in the moderate-high risk category for sex-offense recidivism. Ross Report 15.  That score would correspond to about a 15.9% likelihood of recidivism over a five-year period and about a 22.6% likelihood of sex-offense recidivism over a 10-year period.  Ross Report 15-16.

55.  A score of six, on the other hand, would place Cox in the high risk category.  Ross Report 15.  That score would correspond to about a 20.2% likelihood of sex-offense recidivism over a 5-year period and about a 27.6% likelihood of sex-offense recidivism over a 10-year period.  Ross Report 16.

56.  Dr. Ross also analyzed Cox's risk for recidivism using the STABLE-2007, a dynamic risk assessment instrument.  Ross Report 16.  That instrument takes into consideration the presence of multiple dynamic risk factors, including significant social influences, intimacy deficits, general self-regulation, sexual self-regulation, and cooperation with supervision.  Ross Report 16.

57.  In utilizing the STABLE-2007, Dr. Ross noted that "Mr. Cox's file information was indicative of several of these risk factors," including the lack of positive social influences (i.e., Cox's inability to live with his siblings upon his release), the presence of negative social influences (i.e., "one close friend who [Cox] continues to maintain a relationship

with, but who was incarcerated for his involvement in the instant offenses"), the lack of capacity for relationship stability (i.e., the presence of only one long-term, live-in relationship), a history of sexual pre-occupation (i.e., his administration of the child pornography bulletin boards), and the presence of deviant sexual interests (i.e., his history of child sex abuse and interest in child pornography). Ross Report 16-17. Dr. Ross also noted the lack of protective factors that might mitigate Cox's overall risk. Ross Report 17.

58. On the basis of the foregoing, and having considered Cox's prior offense history, Dr. Ross concluded her report by opining that "Mr. Cox is a person suffering from a serious mental illness, abnormality, or disorder, as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation." Ross Report 18.

**B. Jeffrey Davis, Ph.D.**

59. The Government also presented the testimony of Dr. Davis, whom the Government tendered and the Court accepted as an expert in forensic psychology.

60. After reviewing the report of Dr. Ross and other supporting documentation, Dr. Davis determined that Cox warranted an Axis I diagnosis of pedophilia, attracted to females, nonexclusive type, Davis Report 25, noting that "[v]olitional deficits in controlling criminal sexual behavior

in relation to the mental disorder (i.e., Pedophilia) are clearly evident in this case," Davis Report 26. Dr. Davis based that conclusion on the fact that "Mr. Cox was detected and sanctioned for sexual offending against young girls, and was revoked while on community supervision for similar behavior following release." Davis Report 26. Dr. Davis further noted that Cox "participated in sex-offender specific treatment, but reoffended in the index sex offense," stating that "[h]is prior offenses in a public place, as well as through the Internet (where the possibility of detection was significant), speak to the strength of underlying urges to engage in such behavior." Davis Report 27.

61. Dr. Davis did not, however, diagnose Cox with paraphilia, noting that he considered the diagnosis, but ultimately deferred it on the ground that he could not tell from the information in his possession concerning Cox's convictions for the index offenses whether Cox "specifically sought a pubescent victim," noting that "[h]e may have preferred to seek a prepubescent victim, but could not find the opportunity to do so, making the fictitious victim an acceptable substitute." Davis Report 26.

62. Having diagnosed Cox with pedophilia, Dr. Davis next turned to his analysis of Cox's risk for sex-offense recidivism. Davis Report 27. Like Dr. Ross, Dr. Davis utilized the Static-

99R. Davis Report 27. Dr. Davis supplemented the Static-99R results by additionally utilizing the Static-2002R and the Minnesota Sex Offender Screening Tool-Revised ("MnSOST-R"). Davis Report 27.

63. The Static-2002R, like the Static-99R, assesses an individual's statistical risk for sex-offense recidivism. Davis Report 29-30. "It offers greater range in scoring related to age at the time the inmate is released from the index sex offense." Davis Report 29. It consists of "14 items and produces estimates of relative risk based upon the number of risk factors present in any one individual," dividing the risk factors into five domains: age, persistence of sex offending, deviant sexual interests, relationship to victims, and general criminality. Davis Report 30.

64. "The MnSOST-R," on the other hand, "defines sexual recidivism as likelihood of re-arrest for a contact sexual offense within the first six years of release from incarceration." Davis Report 30.

65. Using the Static-99R, Dr. Davis scored Cox at five or six, consistent with Dr. Ross's findings. Davis Report 27. Dr. Davis noted further, however, that a score of five would place Cox in the 90th percentile of sample groups of adult male sexual offenders, stating that "[t]he recidivism rate for sex offenders with the same score on the Static-99R would be expected to be

approximately 2.2 times the recidivism rate of the typical sexual offender." Davis Report 29 (emphasis omitted). Dr. Davis noted that "[t]he risk estimate for the Static-99R for those samples over a five-year period is about 25 percent," and that "[o]ver a period of ten years, the risk estimate is about 35 percent." Davis Report 37 (emphasis omitted).

66. Using the Static-2002R, Dr. Davis scored Cox at six, placing Cox in the 87th percentile, or high risk category, of sexual offenders and indicating a recidivism rate approximately 1.7 times the recidivism rate of the typical sexual offender. Davis Report 30.

67. Dr. Davis did not provide a detailed explanation for why he scored Cox at six, noting only that he attributed Cox zero points in the age domain, one point in the persistence of sexual offending domain, two points in the deviant sexual interests domain, one point in the relationship to victim domain, and two points in the general criminality domain. Davis Report 30. Dr. Davis noted that, although "there [were] no available recidivism data for the Preselected Treatment Needs samples relative to the Static-2002R," the "reported re-offense rates for the High Risk/Needs samples with a score of six are 24 percent at five years and 34 percent at ten years." Davis Report 37 (emphasis omitted).

68.  Using the MnSOST-R, Dr. Davis scored Cox at eight.
Davis Report 31.  Once again, Dr. Davis did not include any
information in his report concerning how he determined that
score.  Instead, Dr. Davis noted only that "[c]ompared to
representative Minnesota samples with a total of 761 sex
offenders, Mr. Cox's score falls into the approximate 83rd
percentile."  Davis Report 31 (emphasis omitted).  Dr. Davis
noted that "a score of eight points on the MnSOST-R represented
a 30 percent likelihood of rearrest for a contact sexual offense
within six years of [] release from custody."  Davis Report 37
(emphasis omitted).

69.  Like Dr. Ross, Dr. Davis further examined Cox using
the STABLE-2007.  Also like Dr. Ross, Dr. Davis determined that
many of the STABLE-2007 dynamic risk factors militated in favor
of finding an increased risk of sex-offense recidivism, noting
that "association with peers with similar pedophilic interests
has been a component of Mr. Cox's offending behavior," that Cox
had a minimal history of intimate, live-in relationships, that
Cox had a long-standing pattern of sexual interest in
prepubescent and pubescent females, and that "Mr. Cox's
cooperation with supervision in the community has been
problematic."  Davis Report 31-33.

70.  Unlike Dr. Ross, however, Dr. Davis did not
specifically rule out the possibility of applicable protective

factors.  Specifically, with respect to Cox's physical health, Dr. Davis noted that "Mr. Cox does have a number of health issues," stating further that "[i]t is not clear if those problems would have a substantial impact on Mr. Cox's potential time at risk."  Davis Report 37.

71.  Finally, Dr. Davis examined Cox using the Structured Risk Assessment-Forensic Version ("SRA-FV Light").  Davis Report 33.  That tool "identifies relatively enduring psychological factors that function as long-term vulnerabilities for sexual offending."  Davis Report 33.  It functions by providing scores for three domains: sexual interests, relational style, and self-management.  Davis Report 34.

72.  Dr. Davis scored Cox at 3.3 on the SRA-FV Light, which score comprised a score of 1.5 in the sexual-interests domain, due to Cox's sexual preference for children, sexualized violence, and sexualized preoccupation; a score of 1.3 in the relational style domain due to Cox's lack of emotionally intimate relationships with adults and his emotional congruence with children; and a score of 0.5 for self-management, due to Cox's dysfunctional coping.  Davis Report 34-35.

73.  On the basis of the foregoing, Dr. Davis opined that Cox constituted a sexually dangerous person within the meaning of the Adam Walsh Act.  Davis Report 39.

### C.    Joseph J. Plaud, Ph.D.

74.    Finally, the Government presented the testimony of Dr. Plaud, whom the Government tendered and the Court accepted as an expert in forensic psychology.

75.    Following his interview with and evaluation of Cox, Dr. Plaud determined that Cox warranted a diagnosis of pedophilia.   Plaud Report 9.

76.    Upon reaching that conclusion, Dr. Plaud turned to his analysis of Cox's risk for sex-offense recidivism using the Sexual Violence Risk – 20 ("SVR-20"), which instrument Dr. Plaud described as providing "for a research-based methodology designed to evaluate 20 factors or areas of functioning in those who have been either convicted or alleged to have committed a sexual offense."   Plaud Report 10.

77.    In prefacing his findings, Dr. Plaud noted that "[r]isk assessments such as is being performed on Mr. Cox should not be conducted without an understanding of the significant relationship between how old the sexual offender is when he is to be released back into the community, and what we know about the rates of sexual offense recidivism as a function of this aging process."   Plaud Report 10.   He went on to state that "Barbaree et al. (2003) found the following base rates of sexual offense recidivism for sexual offenders who were released at different ages (21-30, 31-40, 41-50, 51+) at 17%, 11%, <u>8%</u>, (Mr.

Cox is currently 50 years old),[4] and 4% respectively." Plaud

Report 10.

78.  In applying the SVR-20, Dr. Plaud noted that Cox's

history warranted positive responses to the following categories

of dynamic risk factors: sexual deviation; relationship

problems; employment problems;[5] past supervision failure; high-

density offenses; multiple offense types; escalation in

frequency/severity; extreme minimization/denial of offenses;

attitudes that support or condone offenses; lack of realistic

plans; and negative attitude toward intervention.  Plaud Report

11.

79.  The results of the SVR-20 led Dr. Plaud to conclude

"that Mr. Cox does present with a significant pattern of risk

factors for engaging in sexually recidivistic behavior."  Plaud

Report 11.  As a result, Dr. Plaud stated, "The net result of

---

[4] The Court notes that in his report, Dr. Plaud misstates Cox's
age.  For the purposes of determining the applicable base rate,
Dr. Plaud treats Cox as 50 years old.  Plaud Report 10.  At the
time of Dr. Plaud's evaluation of Cox, however, Cox was 54 years
old.  The misstatement skews Dr. Plaud's findings because had
Dr. Plaud used the correct age in assessing Cox's base rate, he
would have attributed a four percent, and not an eight percent,
base recidivism rate to Cox.

[5] Contrary to Dr. Plaud's decision to attribute employment
problems to Cox for the purpose of evaluating Cox's risk for
recidivism, BOP records indicate that Cox is a ready, willing,
and capable worker.  Cox submitted as exhibits BOP records of
his job-performance evaluations.  See Resp't Ex. 5-8.  In each
of those evaluations, Cox received above-average scores in every
evaluative category, and he received one score of "Outstanding"
in the "Initiative" category.  Resp't Ex. 6, at 1.

Mr. Cox's current psychological status given the fact that he has both contact and non-contact based sexual offenses, provide support at this time that Mr. Cox would have serious difficulty in refraining from sexually violent conduct or child molestation if he were released." Plaud Report 2.

**D. Cox's Testimony.**

80. Cox also testified at the hearing. He stated that he did not believe that he presently suffered from a serious mental illness that would result in his having serious difficulty in refraining from sexually violent conduct or child molestation if released. Cox Dep. 76:15-19, Government's Ex. 8, at 76:15-19. Cox further testified that he planned to return to the siding business upon his release, and that he had experience in that industry. He also stated that he would run the business from home, as a manager, so that he would not need to enter other people's homes.

**E. The Court's Findings as to Cox's Current Status.**

81. "The question of whether a person is 'sexually dangerous' is 'by no means an easy one,' and 'there is no crystal ball that an examining expert or court might consult to predict conclusively whether a past offender will recidivate.'" Hall, 664 F.3d at 467 (quoting United States v. Shields, 649 F.3d 78, 89 (1st Cir. 2001)).

82.  Nevertheless, the Adam Walsh Act imposes upon the Court the responsibility "to decide among reasonable interpretations of the evidence and determine the weight accorded to expert witnesses."  Id. (quoting Shields, 649 F.3d at 89).

83.  The Court undertakes that responsibility now with regard to the issues dispositive of this action: first, whether Cox currently suffer from a serious mental illness, abnormality, or disorder; and second, whether any such serious mental illness, abnormality, or disorder would cause Cox serious difficulty in refraining from sexually violent conduct or child molestation upon his release from imprisonment.

### 1.  Does Cox Currently Suffer from a "Serious" Mental Illness, Abnormality, or Disorder?

84.  The Court must first resolve whether the Government have met its burden of establishing by clear and convincing evidence that Cox presently suffers from a "serious" mental illness, abnormality, or disorder.  See id. at 461; see also 18 U.S.C. § 4247(a)(6).

85.  The experts unanimously believe that Cox suffers from pedophilia.  Ross Report 13; Davis Report 25; Plaud Report 9. The Court accepts their diagnoses.  The Court, therefore, finds that Cox does, in fact, suffer from pedophilia, which

constitutes a "serious" mental illness, abnormality, or disorder within the meaning of 18 U.S.C. § 4247(a)(6).

86.  The Court declines to find that Cox suffers from paraphilia not otherwise specified.  Only Dr. Ross opined to the contrary.  Ross Report 13.  Dr. Davis deferred that diagnosis on the basis of insufficient information, which information included, importantly, Dr. Ross's report.  Davis Report 26.  Dr. Plaud did not mention paraphilia not otherwise specified as a possible diagnosis.  Plaud Report 9.  The Government has not, therefore, shown by clear and convincing evidence that Cox suffers from paraphilia not otherwise specified.

87.  Additionally, the Court declines to find that Cox suffers from paranoid and narcissistic personality disorders.  Only Dr. Plaud provided those diagnoses.  Plaud Report 10.  Neither of the other experts so much as mentioned them.  Neither does the Court see, nor does Dr. Plaud explain, how those diagnoses, even if accurate, would cause Cox to have serious difficulty in refraining from sexually violent conduct or child molestation upon his release from imprisonment.  In any event, the Government has not carried its burden of proof with respect to the accuracy of those diagnoses in the first instance.

88.  Nevertheless, the testimony of all three expert witnesses suffices to establish that Cox does, in fact, suffer from a serious mental illness, abnormality, or disorder within

the meaning of 18 U.S.C. § 4247(a)(6) (i.e., pedophilia). The Court, therefore, turns to the final question before it: Whether pedophilia will cause Cox to have serious difficulty in refraining from sexually violent conduct or child molestation upon his release.

### 2. Will Cox's Pedophilia Cause Him to Have Serious Difficulty Refraining from Sexually Violent Conduct in the Future?

89. The Court finds that, on this final prong of 18 U.S.C. § 4247(a)(6), the Government has failed to carry its burden of proof. As noted supra, that burden requires the Government to show, by clear and convincing evidence, that Cox's pedophilia impairs his volition to such a degree that it makes him significantly more dangerous than the "dangerous but typical" recidivist offender. Crane, 535 U.S. at 413.

90. "The mere presence of a sexual attraction to minors is insufficient to meet the 'serious difficulty' prong." Order at 10, United States v. Maranda, No. 5:08-HC-2033-H (E.D.N.C. Sept. 6, 2012) (Howard J.), ECF No. 58 (citing United States v. Carta, No. 07-12064, 2011 WL 2680734 (D. Mass. July 7, 2011), aff'd No. 11-1921, 2012 WL 3064842 (1st Cir. July 27, 2012)). Rather, "[i]f the person the government seeks to commit has developed the skills necessary to overcome the urge to have sexual contact with minors without [serious] difficulty, the government fails

in meeting its burden as to this prong of the test." Id.
(quotation omitted).

91. At the outset, the Court notes that it has not
considered Cox's prior convictions for sex-related offenses when
determining whether Cox currently lack volitional control.

92. "When a party attempts to assert a position that is
inconsistent with a prior position that the party has
successfully asserted in another court, courts have a number of
steps that they may take to prevent such an attempted abuse of
the judicial process." Lowery v. Stovall, 92 F.3d 219, 223 (4th
Cir. 1996). Specifically, "courts may apply collateral
estoppel." Id.

93. The doctrine of collateral estoppel prevents
"relitigation of an issue previously decided if the party
against whom the prior decision is asserted had 'a full and fair
opportunity to litigate that issue in the earlier case.'" Combs
v. Richardson, 838 F.2d 112, 114 (4th Cir. 1988) (quoting Allen
v. McCurry, 449 U.S. 90, 94-95 (1980)). "Collateral estoppel
treats as final only those issues 'actually and necessarily
determined' in the prior suit." Id. (quoting Montana v. United
States, 440 U.S. 147, 153 (1979)).

94. The Government prosecuted Cox on the charges
underlying his prior convictions, and did so successfully. Cox's
convictions mean that the respective courts wherein they

- 33 -

occurred (i.e., a general court-martial and the U.S. District Court for the District of Colorado) determined that Cox intentionally or knowingly engaged in the conduct underlying those convictions—that is, Cox's conduct did not result from his volitional impairment.

95. Such determinations are, therefore, a matter of established judicial fact, and the Government cannot, in this subsequent proceeding, renege on the position it took earlier for the very purpose of establishing such fact in order to use those convictions as circumstantial evidence of Cox's volitional impairment here.

96. Neither have the experts presented testimony that would allow the Court to find, by clear and convincing evidence, that Cox lacks volitional control with respect to future sexual violence or child molestation. In their analyses of Cox, each of the experts utilized instruments that predict sex-offense recidivism. The plain language of 18 U.S.C. § 4247(a)(6), however, does not query whether a sex offender will re-offend; rather, it queries whether the sex offender will have serious difficulty in refraining from re-offending. These are two separate questions. Indeed, one person might re-offend as a result of volitional impairment, while another person re-offend as a result of free choice. The Adam Walsh Act protects the public from the former; the criminal law, the latter.

97. The tools that the experts use to assess recidivism barely, if at all, account for the examinee's mental illness, abnormality, or disorder, and the manner in which that disorder might affect the examinee's likelihood of recidivism. See Ryan C. W. Hall, MD, & Richard C. W. Hall, MD, PA, A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues, 82(4) Mayo Clinic Proc. 457, 467 (April 2007) ("Several actuarial and self-report tests have been designed to help physicians and law enforcement officers predict which individuals are at higher risk for repeated offense, but currently no single test or combination of tests can accurately identify the future activity of an individual.").

98. These tools might provide useful insight into recidivism rates among sex offenders, but they do not answer the question the Adam Walsh Act poses: Whether the examinee's mental illness, abnormality, or disorder will cause him serious difficulty in refraining from sexually violent conduct or child molestation upon release. See Frederick Winsmann, Ph.D., Sexual-Offender-Treatment.org, Assessing Volitional Impairment in Sexually Violent Predator Evaluations, http://www.sexual-offender-treatment.org/103.html (distinguishing between volitional impairment and risk for recidivism).

99.  The Government has not shown that causal connection. In fact, of the testifying experts, only Dr. Davis referred expressly to a causal link between Cox's pedophilia and volitional impairment.[6]  See Davis Report 26-27.

100. Dr. Davis identified several instances of conduct that he believed demonstrate Cox's volitional impairment, including Cox's willingness to break the rules of his community supervision in order to re-offend, Cox's engagement in recidivistic behavior following his participation in sex-offender treatment, the fact that Cox's offenses occurred in a public place and on the internet where the risk of detection "was significant," and that Cox declined additional sex-offender treatment while in prison for the index offense.  Davis Report 26-27.

101.  Dr. Davis's testimony does not, however, convince the Court.  The majority of the items that Dr. Davis cites when discussing "[v]olitional deficits" comprise events that occurred more than nine years ago.  The Court fails to see how those events might demonstrate that Cox currently suffers from a mental illness, abnormality, or disorder that will cause him

---

[6] The Court notes that several internal BOP records concerning Cox's mental health report his status as "stable."  Resp't Exs. 1-4.  The Court further notes that, in a medical/psychological pre-release evaluation dated 21 December 2010, BOP staff indicated that Cox presented with "[n]o evidence of mental problems."  Resp't Ex. 39.

serious difficulty in refraining from sexually violent conduct
or child molestation upon his release.

102. The Court further credits the testimony of Cox, whose
testimony appeared thoughtful and sincere. Cox recognizes the
criminal and immoral nature of his prior conduct. He denies
that he currently lacks, to any degree, capacity to control his
conduct. Cox Dep. 76:15-19, Government's Ex. 8, at 76:15-19.
Without additional evidence linking Cox's pedophilia to a
present volitional impairment, the Court has no reason to
believe that Cox does, in fact, lack such capacity.

103. Finally, the Court also notes that, upon his release
from the BOP, Cox will not simply go free. Rather, he will
remain subject to the conditions of his term of supervised
release, which conditions include, inter alia, conditions
requiring Cox to report frequently and honestly to his probation
officer, to notify his probation officer of any change in his
residence or employment, to notify third parties of the risks
that his criminal history and personal characteristics occasion,
to participate in sex-offender treatment—including polygraph and
plethysmograph testing—and to allow his probation officer to
examine and copy at any reasonable time any data that he keeps

on any computer that he uses.[7]  Am. J. 4-5, <u>United States v. Cox</u>,

03-DCR-45-RB-1 (D. Colo. Feb. 24, 2004).

104. Cox recognizes and appreciates that, if he violate any

of the above conditions, it would result in the imposition of an

active term of imprisonment.  Additionally, the Government would

once again have the opportunity to consider certification of Cox

under 18 U.S.C. § 4248.

105. Particularly with these conditions in place, and given

Cox's current physical limitations and his sincere testimony,

the Court rejects a determination that Cox presents a high

likelihood of reoffending and, more importantly for purposes of

the Adam Walsh Act, that Cox suffers from volitional impairment.

106. For all of these reasons, the Government has failed to

prove by clear and convincing evidence that any mental illness,

abnormality, or disorder will cause Cox to have serious

---

[7] The presence of conditions of supervised release is relevant to
the Court's resolution of the question whether a respondent will
have serious difficulty in refraining from sexually violent
conduct or child molestation if released.  <u>See</u> Order at 12-14,
<u>United States v. Maranda</u>, No. 5:08-HC-2033-H (E.D.N.C. Sept. 6,
2012) (Howard J.), ECF No. 58; <u>see also</u> Findings of Fact and
Conclusions of Law at 2, <u>United States v. Begay</u>, No. 5:11-HC-
2197-BO (E.D.N.C. July 25, 2012) (Boyle J.), ECF No. 33
(incorporating therein §§ I and II of Respondent's Proposed
Findings of Fact and Conclusions of Law, including a footnote
approving of the consideration of the presence of applicable
conditions of supervised release, Proposed Findings of Fact and
Conclusions of Law at 46 n.15, <u>Begay</u>, No. 5:11-HC-2197-BO
(E.D.N.C. July 17, 2012)).

difficulty in refraining from sexually violent conduct or child molestation upon his release from imprisonment.

<u>CONCLUSIONS OF LAW</u>

107. In order for the Court to have committed Cox civilly pursuant to the Adam Walsh Act, the Government needed to prove three elements by clear and convincing evidence: (1) that Cox has engaged or attempted to engage in sexually violent conduct or child molestation; (2) that Cox currently suffers from a serious mental illness, abnormality, or disorder; and (3) as a result of that serious mental illness, abnormality, or disorder, Cox would have serious difficulty in refraining from sexually violent conduct or child molestation upon his release from imprisonment.

108. The Government satisfied the first two elements, but failed to satisfy the third.

THE COURT, THEREFORE, DIRECTS the Clerk to enter judgment in favor of the respondent, Earl Webster Cox, and against the petitioner, the United States of America. The Court ORDERS the federal Bureau of Prisons to release Cox forthwith to the appropriate U.S. Probation Office. The Court hereby DISMISSES this action.

This 18th day of September 2012.

Respectfully submitted by,


/s/ Samuel A. Forehand
Samuel A. Forehand
Counsel for Earl Webster Cox
Law Office of Samuel A. Forehand, P.A.
5 West Hargett Street, Suite 810
Post Office Box 2626
Raleigh, North Carolina  27602-2626
Tel: (919) 755-0500
Fax: (919) 755-1000
SAF@ForehandLaw.com
N.C. State Bar No. 35284

**CERTIFICATE OF SERVICE**

The undersigned has this date electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> R.A. Renfer, Jr., Esq.
> G. Norman Acker, III, Esq.
> Michael James, Esq.
> Seth Morgan Wood, Esq.
> Office of the U.S. Attorney
> Eastern District of North Carolina

This 18th day of September 2012.

/s/ Samuel A. Forehand
Samuel A. Forehand
Counsel for Earl Webster Cox
Law Office of Samuel A. Forehand, P.A.
5 West Hargett Street, Suite 810
Post Office Box 2626
Raleigh, North Carolina  27602-2626
Tel: (919) 755-0500
Fax: (919) 755-1000
SAF@ForehandLaw.com
N.C. State Bar No. 35284